UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 23-cr-73 (CKK) |
| : | |
| PAUL ALEJANDRO FELIX (20), : | |
| : | |
| Defendant. : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Paul Alejandro Felix pled guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl. For the reasons stated herein, the Government respectfully requests that the Court sentence the Defendant to 188 months of imprisonment, followed by five years of supervised release.

### Background

From on or about August 2020 and continuing until the date of his arrest, November 16, 2023, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II narcotic drug-controlled substance. The amount of said mixture and substance, including the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was 4-12 kilograms.

Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl from Southern California to destinations throughout the United States, including to the District of Columbia. The Defendant's role in the conspiracy was to serve as an upstream Los Angeles-based supplier of fentanyl-laced counterfeit oxycodone pills to other Los Angeles-based fentanyl traffickers, including co-defendant Hector David Valdez, a co-defendant in the Fourth Superseding Indictment. Valdez in turn was a bulk supplier of fentanyl-laced

counterfeit oxycodone pills to D.C.-based fentanyl traffickers, including twelve of his named co-defendants in Case No. 23-cr-73 (CKK).

The Defendant knew that Valdez was reselling fentanyl-laced counterfeit oxycodone pills that the Defendant had supplied to Valdez. The Defendant sold pills to Valdez by the thousands, often at prices below a dollar per pill. For example, on August 10, 2022, the Defendant sent an Instagram message to Valdez, "I justy gor some" "Today" "Alot" in reference to "blues," or fentanyl-laced counterfeit oxycodone pills. Valdez asked for the pills at a price of 65 cents each, while Felix countered with a price of 70 cents per pill.

Separately, on September 29, 2022, Valdez messaged the Defendant, "I need 15 boats," or 15,000 pills, and later followed up with, "Can you do 60 cents each". The Defendant responded, "I can do 70 pa". The two continued to discuss price. Felix also noted that the pills are "more greenish than blue" and "greenbluishy." In his description of the fentanyl-laced counterfeit oxycodone pills, the Defendant demonstrated an awareness that the pills were more desirable if they more closely resembled authentic oxycodone pills.

Valdez was not the only client of the Defendant's. For example, on August 28, 2022, the Defendant messaged Valdez "Im killing the game w blues", "I sellem for 50 cents". On February 1, 2023, the Defendant texted Valdez, "Thank god pa i didn't sell you the 30 i had" because he ended up selling them for 70 cents.

In total, and prior to his arrest, communications evidence, as well as physical seizures, indicate that the Defendant participated in the transfer of tens of thousands of fentanyl-laced counterfeit oxycodone pills to downstream fentanyl traffickers, who were primarily based in the Los Angeles area, but also operated in different parts of the United States, including Hector Valdez, who then sent tens of thousands of pills to Washington D.C.

**Defendant's Possession of Firearms in Connection with the Conspiracy**

On November 16, 2023, Felix was arrested at his residence in Glendale, CA. Recovered in the residence was his firearm, a Sig Sauer 9mm semi-automatic handgun with a magazine containing seven rounds of ammunition, as well as dozens of rounds of ammunition of various calibers and firearm magazines in various calibers. The Defendant admits that he possessed the weapon, stating that he kept the firearm for protection.

The recoveries from the Defendant's residence on the day of his arrest were unsurprising. Over the course of the investigation, law enforcement obtained numerous photos of firearms from search warrant returns of the Defendant's Instagram account. Examples of such photographs include those where the Defendant is in direct possession of firearms, including in his waistband, as well as various firearm accessories.






Generally, the enhancement articulated under Section 2D1.1(b)(1) applies when it is reasonably foreseeable to a defendant that a co-conspirator would possess a firearm in connection with the conspiracy, and actual knowledge is not required. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 724-25 (D.C. Cir. 1995) ("[T]o hold a defendant liable for possession of firearms by co-conspirators, the district court must make the same individualized findings as with respect to drug transactions: that the conduct was within the scope of that defendant's conspiratorial agreement and that it was reasonably foreseeable."). There is a presumption that the firearm located in the Defendant's residence was connected to his drug trafficking. "In order to overcome the presumption that the gun was possessed in the manner contemplated by the Guidelines, it had to be 'clearly improbable that the gun was connected to the offense.'" *Weedon v. United States*, 666 F. Supp. 2d 1, 5 (D.D.C. 2009) (Kollar-Kotelly, J.) (quoting U.S.S.G. § 2D1.1 cmt. n.3). With respect to the Defendant's firearm, which he was legally prohibited from possessing, there was no other reasonable purpose to be inferred from the circumstances of his admitted possession of the firearm. Indeed, his own admission underlies this conclusion: drug trafficking is an inherently

dangerous business, and he needed to protect himself. What's more, photographs from his social media support the notion that the Defendant trafficked from or otherwise stored narcotics inside of his residence:



The enhancement articulated under Section 2D1.1(b)(1) is applied liberally. Courts have even found the enhancement applicable when a large amount of drugs was within the scope of a person's conspiratorial agreement, in part on the basis that guns are often tools of the drug trade and used to protect drugs and proceeds from drug sales. *See, e.g.*, *Childress*, 58 F.3d at 724-26 (holding that an individualized determination that defendants handled a large amount of drugs and/or cash meant it was reasonably foreseeable to that defendant that a weapon would be possessed as part of the conspiracy); *see also United States v. Batista*, 684 F.3d 333, 343-44 (2d Cir. 2012) (holding that a narcotics detective who became a drug dealer, who knew that drug

dealers often possessed weapons and who knew of the general size and scope of the drug ring could have easily foreseen that a co-conspirator would've possessed a weapon); *United States v. Vasquez-Sanchez*, 169 F. App'x 875, 877 (5th Cir. 2006) (unpublished) (holding that application off the enhancement was proper where a defendant stored a large amount of drugs at a stash house where weapons were present because it is "readily foreseeable that firearms would be employed as tools of the drug trade"); *United States v. Martinez*, 924 F.2d 209, 210 (11th Cir. 1991) (per curiam) (holding that the enhancement applies when the possessor of the gun is charged as a co-conspirator, the defendant is a member of the conspiracy at the time the firearm is possessed, and the possession of the firearm was in furtherance of the conspiracy); *United States v. Bianco*, 922 F.2d 910, 912 (1st Cir. 1991) ("Absent evidence of exceptional circumstances, we think it fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash."); *United States v. Garcia*, 909 F.2d 1346, 1349-50 (9th Cir. 1990) (holding that the enhancement applied to a defendant who had no actual knowledge of his co-conspirator's gun because the gun was possessed by the co-conspirator in connection with a sale involving about 17 kg of cocaine, and the defendant could have reasonably foreseen such possession during such a large sale).

Such an application is not necessary here: the Defendant admitted possessing a firearm, stated he possessed it for protection, and the Court is well aware why drug traffickers need to protect themselves.

### **Statutory Penalties**

Pursuant to Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vi), and 846, the offense of conviction carries a mandatory minimum term of 10 years of imprisonment and a

maximum term of life imprisonment, a fine not to exceed $10,000,000, and a term of supervised release of at least 5 years and up to life.

## Sentencing Guidelines

The Government concurs with the Pre-Sentence Report (ECF No. 453) that the applicable Guideline range in this case is 151 to 188 months. *See* PSR, ¶ 151.

## Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## **Argument**

A sentence of 188 months of imprisonment is appropriate in light of the seriousness of the offense. The Government's recommended sentence is also designed to deter others, promote respect

8

for the law, and offer rehabilitation to the Defendant.

### 1. The Nature, Circumstances, and Seriousness of the Offense

The count of conviction to which the Defendant pleaded guilty is serious. He joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. Indeed, as emphasized repeatedly to the Court, the genesis for this wide-ranging investigation is the overdose death of a young woman in Southeast D.C. after her consumption of a single fentanyl-laced counterfeit oxycodone pill.

According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[1] The lethality of fentanyl is reflected in nationwide statistics: roughly 97,309 people in this country died of drug overdoses in the 12-month period ending in April 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 1, 2024).[2] Of these deaths, roughly 65,787 (or about 68 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health, *Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[3]

---

[1] https://www.dea.gov/resources/facts-about-fentanyl.
[2] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[3] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

9

And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[4] Here, though, the Defendant was doing more than dealing fentanyl. He was dealing fentanyl that was disguised to look like legitimate oxycodone, which can fatally mislead users.

The Defendant's relevant conduct underscores the dangerousness of his profession. As this Court is well aware, drug trafficking is an inherently dangerous business. *See United States v. Bethea*, 763 F. Supp. 2d. 50, 54 (D.D.C. 2011) (Lamberth, J.). Given this fact, it is unsurprising that the Defendant chose to arm himself over the course of his participation in the conspiracy, but it also underscores the dangerousness of his admitted conduct. This District saw 274 homicides in 2023, the highest level in at least 20 years. See MPD, *District Crime Data at a Glance*.[5] About 84 percent of the 203 homicides in 2022 involved the use of a firearm. See MPD, *Annual Report 2022*, 17.[6] The seriousness of the Defendant's conduct merits the Government's requested sentence.

2. **The Defendant's History and Characteristics**

A review of the Defendant's criminal history reveals that his participation in this conspiracy is not aberrational. In May 2018, the Defendant was arrested for possessing ten kilograms or more of methamphetamine with the intent to sell or otherwise transport it. *See* PSR, ¶ 104. The Defendant was sentenced to seven years imprisonment in April 2019, ultimately

---

[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.
[5] https://mpdc.dc.gov/page/district-crime-data-glance.
[6] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR_2022_lowres.pdf.

released in March 2020, and by his own admission, entered into the present fentanyl trafficking conspiracy mere months later. This consideration, along with the need for deterrence, weighs heavily in favor of the Government's requested sentence. The Defendant was convicted of an offense that, if charged federally, would have carried a ten-year mandatory minimum sentence. The Defendant was not deterred whatsoever by this encounter with the justice system, and almost immediately began trafficking narcotics again upon his release from prison.

### 3. Other factors

Given the catastrophic impact of drugs and guns on our community, a sentence of 188 months imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable. A sentence that conforms to the recommended Guidelines range is designed to deter others from making the same choice the Defendant did. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

The Government acknowledges that the Probation Office recommends a departure from the recommended Guidelines range, consistent with the D.C. Circuit's holding in U*nited States v. Smith*. ECF No. 454, at 1 (citing *Smith*, 27 F.3d 649 (D.C. Cir. 1994)). In *Smith*, the D.C. Circuit held that "a sentencing court may depart below the range indicated by the Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise." *Smith*, 27 F.3d at 650. In that case, the defendant, as a result of being a deportable alien, was prohibited from serving any portion of his sentence in a minimum-security prison. *Id*. at 651. In addition, he would have likely been ineligible for the benefits of 18 U.S.C. § 3624(c), which meant he would not have the opportunity to spend the last 10% of his sentence in conditions that would provide a reasonable opportunity to prepare for re-

11

entry into the community. *Id*. at 650-51.

While the *Smith* Court stated that a departure on the basis of these circumstances was not prohibited, the *Smith* Court made clear that it was not "suggest[ing] that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement." *Id*. at 655. The *Smith* Court noted, "as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts, even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved." *Id*. The *Smith* Court made clear its expectation that such departures would be "highly infrequent." *Id*.

Importantly, "[i]mposition of a *Smith* departure is a discretionary decision." *United States v. Galaviz*, 2023 WL 8170998 at *4 (D.D.C. Nov. 24, 2023) (Kollar-Kotelly, J.). Indeed, the "instruction in *Smith* is that alien status is not alone a basis for a lesser sentence." *United States v. Olivares*, 473 F.3d 1224, 1231 (D.C. Cir. 2006). Here, the Defendant's recidivism, the serious nature of the conspiracy in which he participated, as well as his elevated role as an upstream supplier therein all weigh against a *Smith* departure.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Conclusion**

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 188 months of imprisonment, followed by five years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: _/s/ Matthew W. Kinskey_
MATTHEW W. KINSKEY
SOLOMON S. EPPEL
Assistant United States Attorneys
D.C. Bar No. 1031975 (Kinskey)
D.C. Bar No. 1046323 (Eppel)
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530